UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECURITIES AND EXCHANGE          )
COMMISSION,                      )
                                 )
          Plaintiff,             )          No. 12 C 09509
                                 )
     v.                          )
                                 )          Judge Edmond E. Chang
RESOURCES PLANNING GROUP, INC.,  )
AND JOSEPH J. HENNESSY,          )
                                 )
          Defendants.            )

## ORDER

The Securities and Exchange Commission brought this civil enforcement action against Resources Planning Group, Inc. and one of its owners, Joseph Hennessy, for violations of several federal securities laws.[1] *See* R. 1, Compl. The parties entered into a settlement agreement, and this Court entered consent judgments against the Defendants. R. 27, Hennessy Consent J.; R. 32, RPG Consent J. Based on the terms of the consent judgments, the SEC now moves for disgorgement, prejudgment interest,[2] civil penalties, and entry of final judgment against Hennessy and RPG. R. 41, Pl.'s Mot. For the reasons discussed below, Hennessy is ordered to pay $2,277,295.16 in disgorgement, $373,570.43 in prejudgment interest, and $520,000 in civil penalties. RPG must pay $201,015.92 in

---

[1]The SEC claims that RPG and Hennessy violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); the associated regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5; Sections 206(1), 206(2), and 206(4) of the Investment Advisors Act of 1940, 15 U.S.C. §§ 80b-6(1)-(2), (4); and the associated regulation, Rule 206(4)-8(a)(1), 17 C.F.R. § 275.206(4). *See* Compl. ¶ 9.

[2]In the consent judgments, the parties agreed that prejudgment interest would be awarded on any disgorgement amount. Hennessy Consent J. § 5; RPG Consent J. § 2.

disgorgement, prejudgment interest on that amount, and $260,000 in civil penalties.

## I.  Background

Joseph Hennessy and his brother, Terrance, are co-owners and co-principals of RPG, an investment advisory company.[3] Compl. ¶¶ 16-17. Though now "defunct" and "insolvent," RPG is still registered with the SEC. *Id.* ¶ 16; R. 47, Pl.'s Reply Br. at 6. As an investment adviser, RPG "advised clients about investing in securities and received compensation in the form of a management fee based on a percentage of the assets managed." Compl.  ¶ 21. Hennessy was also an investment adviser who made "investment decisions and recommendations . . . for his RPG advisory clients." *Id.* Based on these roles, RPG and Hennessy owed their advisory clients a fiduciary duty. *Id.* ¶ 1.

Hennessy was also a founder and controller of Midwest Opportunity Fund, LLC, a private equity fund formed in 2004. Compl. ¶¶ 1, 19. Midwest made money through management fees charged to portfolio companies that it acquired. *Id.* ¶ 19. In 2007, Midwest, primarily through Hennessy, raised funds to buy an interest in a new portfolio company. *Id.* ¶¶ 22-23. Hennessy recommended investing in Midwest notes and equity to his advisory clients to raise this capital. *Id.* ¶ 23. At least sixteen RPG clients purchased $3.92 million in Midwest units, and three investors (two of whom were RPG clients) purchased $1.65 million in Midwest promissory

---

[3]For the purposes of this motion, all of the allegations in the Complaint are deemed to be true. Hennessy Consent J. § 5; RPG Consent J. § 2.

notes. *Id.* These notes required full repayment within a year with a 15% interest rate; they were also personally guaranteed by Hennessy. *Id.* Hennessy did not disclose to the other note purchasers that he had personally guaranteed the other notes or that he was unable to meet his guarantee obligations. *Id.* ¶ 24. Around the same time, Hennessy misappropriated $350,000 from Client A, who was an RPG advisory client. *Id.* ¶ 25. Client A had authorized Hennessy to invest $350,000 in Midwest units, but Hennessy took $700,000 from Client A's accounts without authorization. *Id.*

As payment on the notes became due, Midwest struggled to meet its debt obligations. Compl. ¶¶ 4, 26. The portfolio companies owned by Midwest were unsuccessful and stopped paying management fees to Midwest. *Id.* As a result, Midwest did not have sufficient funds to repay the Midwest notes. *Id.* To raise capital, Hennessy again turned to RPG clients. *Id.* ¶¶ 27-30. Between September 2007 and March 2010, Hennessy raised $1.36 million in funds for Midwest. *Id.* ¶ 28. Six investors, four of whom were RPG advisory clients, invested $357,000 in Midwest units. *Id.* Five RPG advisory clients invested the remaining $1 million in Midwest promissory notes. *Id.* These notes were not personally guaranteed by Hennessy. *Id.* In soliciting all these investments, Hennessy made knowing misrepresentations and omissions. *Id.* ¶¶ 29-30. He did not tell prospective investors about the true financial condition of Midwest, and he told at least one RPG client that Midwest was "a viable private equity fund that could offer high

3

returns." *Id.* ¶ 30. Through these investments, Hennessy paid off some of the 2007 notes and reduced his personal obligation by $641,408. *Id.*

Hennessy continued to defraud RPG advisory clients. Compl. ¶¶ 31-32. Midwest still could not meet its debt obligations, and Hennessy wrote several checks to note-holders that Midwest did not have sufficient funds to pay. *Id.* ¶ 31. In his effort to raise more capital, Hennessy raised $750,000 from three RPG advisory clients; instead of directing this capital to Midwest, Hennessy used $700,000 to redeem Client A's investment (remember, Client A was the client from whom Hennessy had taken $700,000 to invest in Midwest, even though the client had only authorized $350,000). *Id.* ¶ 32. On two separate occasions, Hennessy forged the signature of an RPG advisory client—a widow in her sixties—to authorize himself to wire $50,000 from her account into Midwest's account. *Id.* He used these two $50,000 transfers to repay the 2007 investors. *Id.* Even after one of Midwest's portfolio companies went into receivership, Hennessy advised an RPG client to invest $157,000 in retirement funds in a Midwest promissory note. *Id.* He told this client that Midwest was a "sound investment" that would "beat the market." *Id.*

RPG and Hennessy both accumulated ill-gotten gains from these fraudulent schemes. Compl. ¶ 34. RPG collected advisory fees from the clients who invested in Midwest; some of the fees were paid to Hennessy as compensation. *Id.* Hennessy also used funds fraudulently raised from his RPG clients to pay down his personal liability by $641,408. *Id.* The SEC further claims that Hennessy received more ill-gotten gains in the form of transfers from the accounts of Midwest investors and

4

RPG into his personal account and the account of Resources Planning Group, LLC (the LLC), a company set up by Hennessy for family use. R. 42, SEC's Br. at 9. The SEC now seeks disgorgement of these ill-gotten gains, prejudgment interest on that amount, and civil penalties against both Hennessy and RPG. *See* SEC's Mot.

## II. Analysis

### A. Disgorgement

Disgorgement is a remedy "designed both to deprive a wrongdoer of unjust enrichment and deter other from violating the securities laws." *SEC v. Michel*, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007); *see also SEC v. DeMaria*, No. 12 C 4145, 2013 WL 4506867, *1 (N.D. Ill. Aug. 22, 2013); *SEC v. Black*, No. 04 C 7377, 2009 WL 1181480, *2 (N.D. Ill. Apr. 30, 2009). It is not a punitive measure. *Rowe v. Maremon Corp.*, 850 F.2d 1226, 1241 (7th Cir. 1988). The district court "has broad discretion in setting the amount of a disgorgement award, and the amount need not be exact." *SEC v. Seven Palm Inv., LLC*, No. 10 C 2755, 2014 WL 1292377, *2 (N.D. Ill. Mar. 31, 2014); *see also Rowe*, 850 F.2d at 1240-41. Salaries and other forms of compensation may be disgorged. *Black*, 2009 WL 1181480 at *2 (citing *SEC v. Koenig*, 557 F.3d 736, 744-45 (7th Cir. 2009)); *SEC v. Church Extension of the Church of God, Inc.*, 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005); *SEC v. Conaway*, No. 2:05-CV-40263, 2009 WL 902063, *20 (E.D. Mich. Mar. 31, 2009)).

The SEC bears the burden of establishing that it is entitled to the remedy by a preponderance of the evidence, and it may use either direct or circumstantial evidence to do so. *SEC v. Koenig*, 532 F. Supp. 2d 987, 993 (N.D. Ill. 2007). To meet

this burden, the SEC must show that the amount of disgorgement is a "reasonable approximation" of the unjust enrichment causally related to the Defendants' wrongdoing. *SEC v. Randy*, 38 F. Supp. 2d 657, 673-74 (N.D. Ill. 1999); *SEC v. Collins*, No. 01 C 3085, 2003 WL 21196236, *5 (N.D. Ill. May 21, 2003). The burden then shifts to the Defendants to show that the approximation is not accurate. *Black*, 2009 WL 1181480 at *2. "Any ambiguities in the SEC's calculation should be resolved against the defendants, and the SEC is not required to trace every dollar of the [ ] defendant's gains." *Seven Palm*, 2014 WL 1292377 at *2; *see also Koenig*, 532 F. Supp. 2d at 994; *Black*, 2009 WL 1181480 at *2.

## 1. Hennessy

The SEC seeks disgorgement from Hennessy from five categories of money: (1) the $641,408.90 by which Hennessy reduced his personal obligation on the Midwest promissory notes; (2) $467,980.11 that he received in compensation from RPG between February 2007 and July 2012; (3) $157,156.00 that Hennessy transferred from the accounts of the Midwest investors to his personal financial accounts; (4) $388,933.80 that Hennessy transferred from the accounts of the Midwest investors to the LLC account; and (5) $621,816.35 that Hennessy transferred from RPG's accounts to the LLC account. The SEC therefore asks that Hennessy disgorge a total of $2,277,295.16 in ill-gotten proceeds from his fraud. Pl.'s Br. at 9-10. For the reasons discussed below, Hennessy is required to disgorge the full amount requested by the SEC.

The SEC first asks that Hennessy disgorge the $641,408.90 by which he reduced his personal liability on the 2007 Midwest promissory notes. Hennessy argues that he did not use these funds to reduce his personal obligation. R. 46, Defs.' Resp. Br. at 5. He claims that some of the payments on the 2007 notes, which came from Midwest accounts, were not made from the funds raised from the Midwest investors; they were made by RPG or his LLC. *Id.* at 5-6. He also argues that one of the payments that *was* made by a Midwest investor was secured by a new note with a personal guarantee by Hennessy. *Id.* He argues, therefore, that he did not reduce his personal obligation on that amount. *Id.* He does admit that $49,500 cannot be accounted for, and he agrees that he should be required to disgorge that amount. *Id.* at 6.

Hennessy's new explanations for these payments, supported only by his declaration and a spreadsheet he created, do not show that the SEC's calculation is inaccurate. Although a party's declaration can, of course, be admissible evidence, Hennessy offers zero supporting records or corroboration of assertions that should be evidenced by business records. More importantly, Hennessy agreed to accept all of the allegations in the Complaint as true for the purposes of this motion. Hennessy Consent J. § 5. The Complaint explicitly says that Hennessy used the funds raised by the Midwest investors, which he procured through misstatements and fraud, to reduce his personal liability. Compl. ¶¶ 4, 6, 8, 27, 30, 34. Hennessy is therefore required to disgorge the $641,408.90.

Next, the SEC asks that Hennessy disgorge the $467,980.11 that he received in compensation from RPG during the period of the fraud. Pl.'s Br. at 9. The compensation was derived from the advisory fees that RPG received from its clients. Defs.' Resp. Br. at 4. The SEC argues that, had Hennessy's clients known of his fraud, they would not have allowed him to keep managing their advisory accounts and he would not have received any compensation. *See* SEC's Reply Br. at 5 (citing *SEC v. Kapur*, No. 11 Civ. 8094(PAE), 2012 WL 5964389, *4 n.5 (S.D.N.Y. Nov. 29, 2012)); *Black*, 2009 WL 1181480 at *2; *SEC v. Teo*, 746 F.3d 90, 107-08 (3d Cir. 2014)). Although the SEC does not provide any direct evidence for this argument, the allegations in the Complaint provide sufficient circumstantial evidence to infer that his clients would no longer use his advisory services if they knew of the fraud. *See Koenig*, 532 F. Supp. 2d at 993 ("The SEC can rely on direct or circumstantial evidence to meet its burden."). Hennessy told his advisory clients, to whom he owed a fiduciary duty, that an investment that he *knew* would *not* be able to meet its debt obligations would "beat the market." Compl. ¶¶ 30, 32. He misappropriated and misdirected a substantial amount of client funds on several occasions. *Id.* ¶¶ 25, 32. He used hundreds of thousands of dollars in client funds to pay down his own debt obligations. *Id.* ¶ 30. Given the type and extent of the Midwest fraud, it is reasonable to infer that, had RPG clients been told of the fraud, they would have withdrawn their funds from RPG and Hennessy would not have received compensation. To be sure, it is conceivable that, in other factual circumstances, an investment advisor need not disgorge all compensation where the misconduct is

8

relatively minor (whether in quantity or type of misrepresentation or both) when compared to the legitimate services provided by the advisor. This is not one of those cases. No investor would have engaged his services had the truth been known to the victims.

Hennessy seeks to rebut the SEC's approximation with evidence that the money RPG paid him was not compensation. Defs.' Resp. Br. at 6-7.[4] Citing only to his own declaration, he claims that what the SEC identified as compensation payments were actually repayments of loans that Hennessy made to RPG (independent of the Midwest fraud). *Id.* at 6; R. 46, Hennessy Decl. ¶ 12. Hennessy cannot meet his burden to show that the SEC's approximation was inaccurate with this evidence, particularly because it contradicts his own discovery responses. In its interrogatories to Hennessy, the SEC asked him to describe all compensation he received from RPG. R. 47-1, Hennessy Interrogatory Resp. ¶ 3. Hennessy pointed the SEC to spreadsheets made by RPG, noting that "[a]ll compensation was in the form of salary or like-kind compensation." *Id.* The spreadsheets label the payments to Hennessy as "Officers Compensation." R. 47-2, RPG Profit and Loss Statements. Because Hennessy does not satisfactorily rebut the SEC's reasonable approximation of ill-gotten gains, he is required to disgorge the $467,980.11 in compensation that he received from RPG.

---

[4]Hennessy also makes a "double counting" argument with respect to his compensation. Defs.' Resp. Br. at 4-5. This argument will be addressed in the section discussing RPG's disgorgement. Part II.A.2.

The SEC also argues that Hennessy should disgorge payments made to his private account or his family's LLC. These transfers can be broken into two groups: (1) $157,156.00 in transfers from Midwest investors to Hennessy's personal account; and (2) $388,933.80 in transfers from Midwest investors to the LLC. *See* Pl.'s Br. at 9-10. The SEC makes two arguments in favor of disgorging these transfers. First, if the Midwest investors who transferred funds to Hennessy's personal account and his family's LLC had known of his fraud, they would not have continued their relationships with Hennessy (or his family's LLC). *See* Pl.'s Reply Br. at 7. As discussed above, there is sufficient circumstantial evidence from which to draw that inference. Indeed, the inference is even stronger when limited to the Midwest investors, who were actually defrauded by Hennessy. Second, there is no legitimate reason for a client to transfer funds directly to an advisor or an LLC that is for family use and is unrelated to advisory services. *Id.* Given the extent of the fraud allegations here, particularly Hennessy's willingness to repeatedly misappropriate his RPG clients' money, the evidence in the Complaint is sufficient to support this inference.

Hennessy's rebuttal evidence is not convincing. He claims that the funds were not related to the Midwest fraud; they supposedly were reimbursements for advanced expenses or fees for non-advisory services. Defs.' Resp. Br. at 7. In support of this contention, Hennessy again cites to his own declaration. *See* Hennessy Decl. ¶ 13. The declaration cites to a spreadsheet that purports to explain the non-Midwest-related reason for each of the payments. *See* Hennessy Decl. Exh. D. There

10

are no citations to receipts for expenses, other agreements that would generate fees, promissory notes mentioned in the spreadsheet, or any other supporting documentary evidence. Hennessy asks the Court to take his word for it. This is not sufficient to meet his burden to show that the SEC's estimate was inaccurate. Hennessy must disgorge the $157,156.00 in transfers from Midwest investors to Hennessy's personal account and the $388,933.80 in transfers from Midwest investors to the LLC.

Finally, the SEC asks that Hennessy disgorge $621,816.35 in transfers from RPG to the LLC. *See* Pl.'s Br. at 10. The SEC argues that these transfers are essentially the same as compensation to Hennessy because the LLC was created for the benefit of Hennessy's family. Pl.'s Reply Br. at 7. As discussed above, the SEC met its initial burden with respect to the compensation, and it has met its burden here for the same reasons. Hennessy again responds that the funds were not tied to the fraud. Defs.' Resp. Br. at 8.[5] He cites only to his own declaration. *See* Hennessy Decl. ¶ 15. He does not identify what the payments were; he simply says that "there is no basis to conclude that the funds have anything to do with Midwest Investors, Midwest investments or my conduct of which the SEC complains." *Id*. This bare conclusion, with no other support, is not sufficient to rebut the SEC's approximation. Hennessy is therefore required to disgorge the $621,816.35 in transfers from RPG to the LLC.

---

[5]Hennessy also makes a "double counting" argument with respect to his compensation. Defs.' Resp. Br. at 4-5. This argument will be addressed in the section discussing RPG's disgorgement. Part II.A.2.

11

In his response, Hennessy also claims that any disgorgement that the Court awards should be offset by voluntary payments he made to his advisory clients. Defs.' Resp. Br. at 9. He claims that he paid $1,346,500 in cash and property to Midwest investors. *Id.* Again, Hennessy cites only to his own declaration and a spreadsheet that includes "JHH Notes" that explain that each was a full release and satisfaction of the client's claim against him. *See* Hennessy Decl. ¶ 17, Exh. G. He does not provide any copies of the settlement agreements with those clients. He does not identify the property he supposedly gave over. He does not even say whether the "JHH Notes" are contemporaneous with the transactions or written for the purposes of this motion. Because there is no proof of these repayments apart from Hennessy's unsupported statements, Hennessy's disgorgement will not be reduced. The full amount that Hennessy must disgorge is $2,277,295.16.

Under the consent judgment, Hennessy agreed to pay prejudgment interest calculated from November 28, 2007 on any disgorged amount. *See* Hennessy Consent J. § 5. Therefore, Hennessy is also required to pay $373,570.43 in prejudgment interest on the disgorgement award. *See* Pl.'s Br. at 10; R. 42-2, Aguilar Decl. ¶ 13, Exh. H.

## 2. RPG

The SEC also seeks $1,290,812.38 in disgorgement from RPG. Pl.'s Br. at 10. This is the amount of advisory fees that RPG received from advisory clients who invested in Midwest during the relevant period. *Id.*; *see also* Aguilar Decl. ¶ 6, Exh. A. Hennessy first argues that these fees should not be disgorged because, though all

12

the fees are from clients who invested in Midwest, they are not all tied to the fraud. Defs.' Resp. Br. at 3. For the reasons discussed above (when rejecting the similar argument made by Hennessy as to his compensation), this contention is rejected. Hennessy's second argument is that counting both RPG's revenue from its advisory clients and the compensation and money transfers that RPG paid to Hennessy and the LLC would be double counting. *Id.* at 4-5, 9. Because Hennessy's compensation was derived from advisory fees, requiring the Defendants to return both the fees and the compensation would be disgorging the same money twice. Transfers from RPG to LLC were included in Hennessy's disgorgement obligation for precisely the same reason as his compensation: he would not have received this money had the investors—the source of those payments—known of the fraud. Disgorgement is not meant to be punitive. *Rowe*, 850 F.2d at 1241. It is meant to deprive the wrongdoers of their ill-gotten gains. Since a portion of RPG's ill-gotten gains were passed through to Hennessy (and his family's LLC), it would be inequitable to require RPG to disgorge this money. Therefore, the amount that RPG must disgorge is reduced by the payments made to Hennessy ($467,980.11) and the LLC ($621,816.35). RPG is ordered to disgorge $201,015.92.

RPG also agreed to pay prejudgment interest on any disgorged amount. *See* RPG Consent J. § 2. The parties agreed that prejudgment interest would be calculated based on the IRS rate for underpayment of taxes. *See id.*; Pl.'s Br. at 10. Because the disgorgement award against RPG has been reduced to avoid double counting, the prejudgment award must be recalculated. RPG will be required to pay

13

the recalculated amount of prejudgment interest on the $201,015.92 it must disgorge. The SEC may submit a motion to amend the judgment with the recalculated interest, if the agency believes it is worth doing (RPG is insolvent).

### B. Civil Penalties

The SEC also asks the Court to impose the maximum allowable civil penalties against Hennessy and RPG. Pl.'s Mot. at 1. The penalties serve to punish those who violate the securities laws and deter future violations. *See SEC v. Coates*, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001). Under Section 20(d) of the Securities Act, Section 21(d)(3) of the Exchange Act, and Section 209(e) of the Advisers Act, the Court may authorize civil penalties against the Defendants. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e). The statutes describe three tiers of civil penalties; the highest (third) tier applies when the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *See* 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii); 15 U.S.C. § 80b-9(e)(2)(C). Based on the extent and magnitude of the fraud described in the Complaint and the high risk of loss to RPG clients who were fraudulently induced to invest in a failing private equity fund, the actions of RPG and Hennessy fit this description.

For third-tier penalties, the maximum that can be imposed is the higher of (1) $130,000 for natural persons or $650,000 for other persons for each violation; or (2) the gross amount of pecuniary gain to such defendant as a result of the violation.

*Id.*; *see also* 17 C.F.R. Part 201 Table III to Subpart E (adjusting statutory penalties for inflation). The SEC notes that "each violation" has been interpreted to mean (1) each claim against a defendant, (2) each misrepresentation by a defendant, and (3) each investor defrauded by a defendant, "among other methodologies." *See* Pl.'s Br. at 11. The SEC does not, however, stake a position on which method it believes should apply in this case. Nor does it provide any discernible count of claims against the Defendants, misrepresentations by the Defendants, or even the number of Midwest investors who were defrauded by the Defendants.

Nevertheless, subject to the statutory maximum, the penalty "shall be determined by the court in light of the facts and circumstances" of the case. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e); *see also SEC v. Jakubowski*, No. 94 C 4539, 1997 WL 156544, *3 (N.D. Ill. Mar. 31, 1997). "[T]he court should consider the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities." *Church Extension*, 429 F. Supp. 2d at 1050. In deciding the amount of the penalty, a court may also consider any other penalties already imposed against the defendants and the defendants' ability to pay. *See id.* at 1051; *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

For their part, Hennessy and RPG argue that they are not recidivists, they cooperated with the SEC in this investigation by entering into the consent

15

judgments, and that neither has the current ability or future hope to pay a penalty. Defs.' Resp. Br. at 11-12. RPG was dissolved with no assets, and Hennessy claims that he struggles to support his family. *Id.* at 11. The SEC claims, however, that Hennessy has a net worth of $2 million, including a house, investments, and compensation from serving as a director and trustee of another company. Pl.'s Reply Br. at 9-10. The SEC also claims that the Defendants did not enter into a cooperation agreement or settlement with the SEC, they merely consented to jurisdiction on a "neither admit nor deny" basis. Although Defendants' limited form of cooperation and modest ability to pay (modest after considering the amount of the disgorgement that Hennessy must pay) might be overstated in their response, those factors still militate against imposing the highest possible civil penalties. Furthermore, based on the amount of disgorgement ordered, it is unlikely that either Defendant will be able to pay much more in penalties.

Ultimately, the fraud that Hennessy and RPG committed was pervasive, predatory, damaging, and lasted for five years. The Defendants took advantage of clients who depended on their advisers to protect their best interests. There are, however, more egregious frauds than what the Defendants committed here. There is little information about the particular vulnerability of any of the Midwest investors, and the Defendants did make some effort to return misappropriated money. In order to appropriately punish the Defendants and deter future violations, Hennessy must pay $520,000 in penalties and RPG must pay $260,000. From the materials provided by the SEC, the Court is able to discern at least eight separate Midwest

investors. *See* Compl.; Aguilar Decl. Exhs. E, F. (There are probably more, but the complaint is not clear about whether any of the investors mentioned are different from ones mentioned elsewhere in the complaint.) Applying the "each investor" methodology to calculate the civil penalty amount, Hennessy would be required to pay $1,040,000 if the statutory maximum of $130,000 was applied to each of the eight investors.[6] Given the mitigating factors discussed above, half of that amount would be a reasonable and effective punishment for Hennessy and a deterrent against future violations. Given RPG's inability to pay, a lesser amount would be sufficient to punish and deter. Accordingly, Hennessy is assessed civil penalties of $520,000, and RPG is assessed civil penalties of $260,000.

---

[6]Hennessy's gross amount of pecuniary gain (the amount he must disgorge) is the statutory ceiling on his penalties, but the mitigating factors discussed in the opinion counsel against applying the maximum here.

17

## IV. Conclusion

For the reasons stated in this opinion, Hennessy is ordered to pay $2,277,295.16 in disgorgement, $373,570.43 in prejudgment interest, and $520,000 in civil penalties. RPG is ordered to pay $201,015.92 in disgorgement, prejudgment interest on that amount (which must be recalculated, if the SEC wishes to pursue it), and $260,000 in civil penalties.

ENTERED:


      s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: September 29, 2014

18